GENERAL REINSURANCE CORPORA-
TION, Plaintiff,

v.

PLYMOUTH MUTUAL LIFE INSUR-
ANCE COMPANY and George Wash-
ington Life Insurance Company, De-
fendants.

No. 66 Civ. 3594.

United States District Court
S. D. New York.

Jan. 18, 1968.

Satterlee, Warfield & Stephens, New York City, for plaintiff, Henry J. Formon, Jr., New York City, of counsel.

Rein, Mound & Cotton, New York City, for defendant, Plymouth Mutual Life Ins. Co., Bert Cotton, New York City, of counsel.

Glatzer, Glatzer & Evans, New York City, for defendant, George Washington Life Ins. Co., John H. Wilbur, Jacksonville, Fla., of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff General Reinsurance Corporation instituted this diversity action against defendants Plymouth Mutual Life Insurance Company (Plymouth) and George Washington Life Insurance Company (George Washington) alleging in the first claim of its amended complaint that plaintiff and Plymouth entered into a Retrocessional Agreement (the Plymouth Retrocessional Agreement); that under this agreement, sums of money in the amount of $388,000 are due and owing by Plymouth to plaintiff; and that Plymouth has not paid to plaintiff the amount due, as required by the agreement. In the third claim of its amended complaint, plaintiff alleges that George Washington and Plymouth entered into a Reinsurance Treaty and Assumption Agreement (George Washington Assumption Agreement); that in this agreement George Washington agreed to pay all claims or liabilities arising out of policies reinsured with or assumed by Plymouth, including the claims arising out of the Plymouth Retrocessional Agreement; and that

George Washington has not paid any of the money due and owing plaintiff under the Plymouth Retrocessional Agreement.

Plaintiff moves pursuant to Rule 56, F.R.Civ.P., for summary judgment against Plymouth on the first claim of the amended complaint for the amount therein alleged to be due plaintiff; [1] or, in the alternative, for an order pursuant to Rule 56(d), F.R.Civ.P., specifying facts "that appear without substantial controversy." Plaintiff further moves for an order: 1) enjoining Plymouth from transferring or assigning any assets to George Washington; 2) directing Plymouth to procure the return of its assets from George Washington; and, 3) enjoining Plymouth from being dissolved. George Washington moves pursuant to Rule 12(b), F.R.Civ.P., for an order dismissing the amended complaint against it for lack of personal jurisdiction and for an order quashing service of process upon it on the ground that service was improper.

*Background*

By agreement dated May 21, 1965, effective August 1, 1965, Central National Life Insurance Company of Omaha (CNL) appointed Loyalty Life Insurance Agency, Inc. (Loyalty), of Philadelphia, Pa., as its Manager of Student Accident Insurance and Student Athletic Insurance (Student Insurance business). Under this agreement, Loyalty was to write student insurance policies for CNL and to handle and pay claims.

By Agreement No. 3418 dated April 14, 1965, effective August 1, 1965 (the CNL Reinsurance Agreement), plaintiff reinsured CNL for 100% of the losses and adjustment expenses on the Student Insurance business written by CNL through Loyalty. CNL agreed to pay plaintiff 100% of the net premiums actually collected by CNL from Loyalty.

---

1. At argument of this motion, the court granted leave to plaintiff to file a supplemental amended complaint against Plymouth, George Washington, and others. The first claim of the supplemental amended complaint differs from the first claim of the amended complaint only, in that plaintiff alleges $400,095.10 rather than $388,000 is due and owing by Plymouth to plaintiff under the Plymouth Retrocessional Agreement.

Any balance due either party was to be remitted on a monthly basis. By an endorsement dated November 4, 1965, retroactive to August 1, 1965, Central National Insurance Company of Omaha (CN), the parent of CNL, was added as a party to the CNL Reinsurance Agreement.

In the Plymouth Retrocessional Agreement, dated June 21, 1965 and effective August 1, 1965, as amended by an endorsement dated December 10, 1965, retroactive to August 1, 1965, Plymouth agreed: 1) to reinsure 60% of plaintiff's reinsurance liability to CNL and CN under the CNL Reinsurance Agreement; 2) to "reimburse [the plaintiff] promptly for 60% of all losses, claims and adjustment expenses that [plaintiff] pays or allows under the terms and conditions of the [CNL Reinsurance Agreement]." Plaintiff agreed to pay Plymouth 60% of the premiums collected by plaintiff less a commission of 27½% and less 60% of the premium taxes allowed under the CNL Reinsurance Agreement. By agreement effective September 1, 1965, plaintiff agreed to pay Plymouth the losses on any accident covered by the CNL Reinsurance Agreement in excess of $15,000 but not more than $250,000.

In the George Washington Assumption Agreement, dated December 12, 1966 and effective January 1, 1967, George Washington reinsured 100% of every policy previously issued by or reinsured with or assumed by Plymouth, and Plymouth agreed to transfer substantially all its assets to George Washington.

*Plaintiff's Motion for Summary Judgment*

Plaintiff contends that it is entitled to summary judgment as to liability because Plymouth has admitted execution of the Plymouth Retrocessional Agreement, plaintiff's demand for payment, and Plymouth's non-payment. Plymouth concedes only that under the agreement it agreed to reinsure plaintiff to the extent of 60% of plaintiff's reinsurance liability to CNL and CN under the CNL Reinsurance Agreement.

Presumably, from figures received from Loyalty, CNL prepared and sent to plaintiff monthly statements showing losses and expenses paid and premiums collected, from the inception of the CNL Reinsurance Agreement. Plaintiff made payments to CN and CNL on the basis of these statements and plaintiff claims there is due and owing from Plymouth the sum of $400,095.10.[2] CNL sent

2. This figure was computed as follows:

| | | | |
|---|---|---|---|
| 1. | Total premiums written | $1,932,613.29 | |
| 2. | 60% of premiums retroceded to defendant under Article 3 of Agreement (60% of #1) | | $1,159,567.99 |
| 3. | Plaintiff's payments to Central National Life | $1,729,087.09 | |
| 4. | 60% of plaintiff's payments assumed by defendant Plymouth under Article 5 of Agreement (60% of #3) | | $1,037,452.25 |
| 5. | 27½% commission for plaintiff on retroceded commissions (27½% of #2) | | 318,881.20 |
| 6. | Premium taxes under underlying contract | $47.053.26 | |
| 7. | 60% of premium taxes allowed to plaintiff | | 28,231.96 |
| 8. | Commission adjustment under Article 4 of Agreement | | 77,304.53 |
| 9. | Payment to defendant Plymouth for share of premiums | | 97,793.15 |
| 10. | Gross amount owed to plaintiff by defendant Plymouth (total of #s 4, 5, 7, 8, 9) | | 1,559,663.09 |
| 11. | Total amount owed to plaintiff by defendant Plymouth under Agreement (#10 less #2) | | $ 400,095.10 |

copies of these monthly statements to Loyalty, but not to Plymouth.

Plymouth contends the figures are unsubstantiated, and disputes their accuracy. Plymouth denies that it owes anything to plaintiff under the Plymouth Retrocessional Agreement.

■ Plaintiff states that Plymouth is bound by the figures contained in the monthly statements. Various grounds for this are asserted. Plaintiff says this is the customary practice in the reinsurance field. Moreover, plaintiff states that Plymouth and Loyalty occupied the same offices and had some common officers, and that Plymouth used the figures in the monthly statements during the course of its correspondence with plaintiff in connection with the agreement. However, the weight to be accorded these contentions can only be determined after the facts are fully developed and it is ascertained whether CNL's monthly statements properly reflected the figures received from Loyalty and were limited to the business covered by the CNL Reinsurance Agreement. The only evidence of acceptance by Plymouth of the figures contained in these monthly statements is a letter dated July 29, 1966 from Schervone, Vice President of Plymouth, to an officer of plaintiff, to which is annexed what would appear to be a report as of July 29, 1966 indicating a balance in Plymouth's favor.

Therefore, the liability of Plymouth as well as the amount thereof, if any, must await trial. However, it seems clear that Plymouth's Retrocessional Agreement covers Student Insurance business originally reinsured by CN.

Pursuant to Rule 56(d), F.R.Civ.P., the following facts appear to be without substantial controversy:

1) By an agreement dated May 21, 1965, effective August 1, 1965, CNL appointed Loyalty as its Manager of Student Insurance business. Loyalty agreed to be "responsible * * * for the production, underwriting, claims, records and general supervision * * *" of Student Insurance business and to send to CNL monthly reports showing "premiums written, losses and loss adjustment expenses paid during the preceding month" and showing "losses incurred but not paid at the end of the preceding month * * *" Upon "cancellation of any reinsurance agreements covering the business written under [the agreement]," the agreement terminated automatically.

2) By an agreement dated April 14, 1965, effective August 1, 1965, and by an endorsement dated November 4, 1965, retroactive to August 1, 1965 (CNL Reinsurance Agreement), plaintiff reinsured CN and CNL, a subsidiary of CN, for 100% of all Student Insurance business written by CN and CNL through Loyalty. The agreement provided that the agreement could be "terminated on July 31st of any year by either party giving the other at least 90 days' prior written notice * * *" in which event, as to policies reinsured by plaintiff at the date of termination, the agreement would continue until the natural expiration of such policies.

3) By an agreement dated June 21, 1965, effective August 1, 1965, and an endorsement dated December 10, 1965, retroactive to August 1, 1965 (Plymouth Retrocessional Agreement), Plymouth agreed to reinsure plaintiff for 60% of plaintiff's reinsurance liability to CN and CNL under the CNL Reinsurance Agreement. Plymouth agreed to reimburse plaintiff "promptly for 60% of all losses, claims and adjustment expenses" that plaintiff paid or allowed under the terms of the CNL Reinsurance Agreement. The agreement provided for termination upon the termination of the CNL Reinsurance Agreement and upon the same conditions of termination as set forth in the CNL Reinsurance Agreement.

4) By an agreement effective September 1, 1965, plaintiff agreed to pay Plymouth the amount of loss in excess of Plymouth's "RETENTION" ($15,000)

but not more than the "MAXIMUM AMOUNT TO BE REINSURED WITH" plaintiff ($250,000), on each accident covered by the CNL Reinsurance Agreement and the Plymouth Retrocessional Agreement.

### Defendant George Washington's Motion to Dismiss

George Washington moves to dismiss the amended complaint for lack of personal jurisdiction and to quash service of process upon it on the ground that service was improper. George Washington is a stock life insurance company organized under the laws of West Virginia with executive offices in Florida, is not licensed to do business in New York, and has no agents, representatives, or employees in New York.

In the Plymouth Retrocessional Agreement, Plymouth agreed that if it failed to pay to plaintiff any amount claimed to be due under the agreement, it would, at the request of plaintiff, "submit to the jurisdiction of any Court of competent jurisdiction within the United States and [would] comply with all requirements necessary to give such Court jurisdiction * * *." Plymouth further agreed to designate the Superintendent of Insurance of the State of New York as its "true and lawful attorney, upon whom may be served all lawful process in any action, suit or legal proceeding arising out of this Agreement, instituted by or on behalf of [plaintiff], * * *." Therefore, with respect to claims for amounts alleged to be due under the Plymouth Retrocessional Agreement, Plymouth agreed to submit to the jurisdiction of this court.

The George Washington Assumption Agreement provides as follows:

"GW [George Washington], * * * agrees to pay all claims that have arisen or may arise under the terms and conditions of The Reinsured Policies; all rights of defense available to Plymouth under the terms of The Reinsured Policies shall be available to GW; GW's position with reference to The Reinsured Policies shall be precisely that of Plymouth's."

\* \* \* \* \* \*

"GW shall carry out all of the provisions contained in and perform all of the duties imposed upon Plymouth by The Reinsured Policies, the same as if GW had issued said policies in the first instance, * * * subject to the same restrictions, terms, conditions, provisions, modes of settlement, and in the case of loss, payable at the same time and in the same manner as provided in The Reinsured Policies."

The term "Reinsured Policies" is defined as "each and every policy of insurance previously issued by or reinsured with or assumed by Plymouth as of the Effective Date [Jan. 1, 1967] to the full extent of each and every provision of each and every such policy." The policies which Plymouth reinsured under the Plymouth Retrocessional Agreement constituted "Reinsured Policies," as to which the George Washington Assumption Agreement provided that George Washington's position would be "precisely that of Plymouth's."

On December 9, 1966, a meeting of George Washington's board of directors was held in New York, and at the meeting, officers of George Washington were authorized and directed to enter into and execute the George Washington Assumption Agreement, the agreement out of which plaintiff's claim against George Washington arises. Between November 1965 and October 1967, substantially all the officers and directors of George Washington were also officers or directors of Plymouth and it appears that between February 1965 and September 1966 several of them came to New York in connection with Student Insurance business.

Service was made on George Washington as follows:

1) On June 2, 1967, copies of a summons and the amended complaint were delivered to the Superintendent of Insurance of New York.

2) On June 6, 1967, copies of a summons and the amended complaint were delivered to the State Auditor of West Virginia, and copies were delivered to the Insurance Commissioner of Pennsylvania.

3) On June 9, 1967, copies of a summons and the amended complaint were again delivered to the Superintendent of Insurance of New York.

4) Copies of a summons and the amended complaint were sent by registered mail to George Washington at 501 National Bank of Commerce Building, Charleston, West Virginia, and on June 13, 1967 a return receipt was signed on behalf of George Washington.

■ The service made upon George Washington as aforesaid was sufficient to give this court jurisdiction because in the George Washington Assumption Agreement, George Washington expressed its intent to consent to jurisdiction to the extent agreed upon by Plymouth with plaintiff in the Plymouth Retrocessional Agreement. Cf. Farr & Co. v. Cia. Intercontinental De Navegacion De Cuba, 243 F.2d 342 (2d Cir. 1957); Bowles v. J. J. Schmitt & Co., 170 F.2d 617 (2d Cir. 1948); Hirsch Fabrics Corp. v. Southern Athletic Co., 98 F.Supp. 436 (E.D.Tenn.1951); Ripley Fabrics Corp. v. Hymen, 91 F.Supp. 1007 (N.D.Ill.1950); Gilbert v. Burnstine, 255 N.Y. 348, 174 N.E. 706, 73 A.L.R. 1453 (1931); compare Berkman v. Ann Lewis Shops, Inc., 246 F.2d 44 (2d Cir. 1957).[3]

Since the court has jurisdiction over Plymouth under the Plymouth Retrocessional Agreement, it also has jurisdiction over George Washington under that agreement and the George Washington Assumption Agreement.[4]

There is no basis for George Washington's contention that it is not subject to jurisdiction in this action because it was merely a guarantor of Plymouth's obligations. The George Washington Assumption Agreement makes it clear that George Washington assumed Plymouth's liability under the Plymouth Retrocessional Agreement with respect to policies reinsured with Plymouth as of January 1, 1967. See generally, 13

3. In the George Washington Assumption Agreement, George Washington designated the Insurance Commissioner of Pennsylvania "as its agent to accept service of process for actions brought by policyholders named in the Reinsured Policies." George Washington argues that making this designation in the agreement without making any others demonstrates that George Washington did not agree to submit to the jurisdiction of this court. The designation is limited, however, to "actions brought by policyholders named in the Reinsured Policies," and its purpose is to specifically protect policyholders resident in Pennsylvania. The designation does not preclude a finding that George Washington also agreed to submit to the jurisdiction of other courts having jurisdiction over Plymouth.

4. George Washington may also be subject to jurisdiction under Section 302(a), New York Civil Practice Law and Rules, and Section 59-a(2), New York Insurance Law, McKinney's Consol.Laws, c. 2.
   In arguing that it is not subject to this court's jurisdiction, George Washington cites Kaye-Martin v. Brooks, 267 F.2d 394 (7th Cir.), cert. denied, 361 U.S.

832, 80 S.Ct. 84, 4 L.Ed.2d 75 (1959) and Benson v. Brattleboro Retreat, 103 N.H. 28, 164 A.2d 560 (1960), cert. denied, 365 U.S. 870, 81 S.Ct. 905, 5 L.Ed. 2d 861 (1961). These decisions are inapposite. In Kaye-Martin v. Brooks, plaintiff contended the court had jurisdiction because plaintiff and defendant met fortuitously at a convention in Chicago. The defendant came to Chicago to attend the convention and not to meet with plaintiff. In Benson v. Brattleboro Retreat, two meetings of the defendant corporation's board of trustees were fortuitously held in New Hampshire and the question before the court was whether defendant was doing business in New Hampshire, rather than whether defendant had transacted any business in New Hampshire. Compare New York Business Corporation Law, McKinney's Consol.Laws, c. 4, § 1301; Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965); Zacharakis v. Bunker Hill Mut. Ins. Co., 281 App.Div. 487, 120 N.Y.S.2d 418 (1st Dept.1953); see generally, McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223 (1957).

Appleman, Insurance Law and Practice, §§ 7741 and 7754–7755 (1943).

■ By letter dated April 15, 1966, plaintiff terminated the CNL Reinsurance Agreement, effective July 30, 1966 and thereby terminated the Plymouth Retrocessional Agreement. George Washington contends that by reason of the termination of the Plymouth Retrocessional Agreement, the provisions of the agreement became ineffective as of July 30, 1966, including those provisions, if any, which together with the provisions of the George Washington Assumption Agreement, constituted an agreement on the part of George Washington to submit to the jurisdiction of this court. The Plymouth Retrocessional Agreement provides that it

> "shall continue in force until the termination of the * * * [CNL Reinsurance Agreement], except that * * * [it] may be cancelled on July 31st of any year by either party giving to the other at least 120 days' prior written notice by registered mail. The conditions of the termination shall be as set forth in the * * * [CNL Reinsurance Agreement]."

The provision of the CNL Reinsurance Agreement concerning termination reads as follows:

> "This Agreement may be terminated on July 31st of any year by either party giving the other at least 90 days' prior written notice by registered mail. In the event of termination of this Agreement, all cessions in force at the date of termination shall, unless otherwise agreed between the parties hereto, continue to their natural expiration."

Under the terms of the CNL Reinsurance Agreement, "cessions" means the transfer of policies of insurance to plaintiff for reinsurance. Since "all cessions in force at the date of termination * * * continue to their natural expiration," termination of the Plymouth Retrocessional Agreement does not make the pro-

visions of the agreement ineffective as to policies reinsured by Plymouth prior to July 30, 1966. The claims asserted by plaintiff in this action involve policies reinsured prior to that date, as to which the Plymouth Retrocessional Agreement and the George Washington Assumption Agreement remained in effect. Accordingly, the court has jurisdiction over George Washington. George Washington's motion to dismiss the amended complaint and to quash service of process upon it is denied.

*Plaintiff's Motion for Injunctive Relief*

■ In the amended complaint, plaintiff seeks money damages only, and it does not yet have a judgment against Plymouth. Under the terms of the George Washington Assumption Agreement, George Washington assumed the liability of Plymouth, if any, to plaintiff under the Plymouth Retrocessional Agreement, which would include any amount as to which plaintiff obtains judgment under the first claim of the amended complaint. George Washington will be jointly liable with Plymouth for any such judgment recovered by plaintiff. Therefore, even if the court has the power to grant the injunctive relief sought by plaintiff (see Reconstruction Finance Corp. v. Central Republic Trust Co., 30 F.Supp. 933 (N.D. Ill.1939)), there is no need for such relief. Moreover, the George Washington Assumption Agreement was approved by the Insurance Commissioner of Pennsylvania and the Insurance Commissioner of West Virginia and any injunctive relief would prefer plaintiff's claim and could work a hardship on other creditors and the Plymouth and George Washington policyholders.

Plaintiff's motion for an order enjoining the transfer of Plymouth's assets to George Washington, directing Plymouth to procure the return of its assets from George Washington, and enjoining Plymouth from being dissolved, is denied.

Settle order on notice.