**NORDIC BANK PLC, Plaintiff,**

v.

**The TREND GROUP, LTD., Lease Trend Company, William Klein, Chase Manhattan Bank, N.A., First National Bank of Louisville, Provident National Bank, the Connecticut Bank and Trust Co., N.A., General Motors Acceptance Corporation, Ultra Funding Corporation, Northeastern Bank of Pennsylvania, Ford Motor Credit Company and Citibank, N.A., Defendants.**

**The TREND GROUP LTD., formerly Conn-Trend Leasing Corporation and Lease Trend Corp., Lease Trend Company, formerly Flourtown Leasing, Inc., Serv Trend, N.V. and Moss Vend, Ltd., Plaintiffs,**

v.

**NORDIC BANK PLC LONDON, Nordic American Banking Corporation, Svenska Handelsbanken, Den Norske Creditbank, Copenhagen Handelsbank A/S, Kansallis Osake Pankki, Jan E.H.M. Ekman, John Sclater, John R. Nelson, Michael S. Mathews, Hans Ostergaard, Erling Naper, Olli Kaila, Nordic Finance Limited, Nordic Leasing Limited, and Stewart G. Smith, Defendants.**

No. 83 Civ. 9107 (GLG).

United States District Court,
S.D. New York.

Sept. 17, 1985.

Kraver & Martin, New York City, for plaintiffs; Richard M. Kraver, Lewis S. Fischbein, of counsel.

Butler, Fitzgerald & Potter, P.C., New York City, for defendants Nordic Bank PLC, Nordic American Banking Corp., Svenska Handelsbanken, Kansallis Osake Pankki, Jan E.H.M. Ekman, Olli Kaila, John Sclater, John R. Nelson, Michael S. Mathews, Nordic Finance Limited, Nordic Leasing Limited, Stewart G. Smith; Stuart Potter, Susan A. Glover, Joyce H. Young, of counsel.

Davis, Polk & Wardwell, New York City, for defendants Copenhagen Handelsbank A/S, Den Norske Creditbank, Hans Ostergaard, and Erling Naper; Richard E. Nolan, Christian J. Mixter, Julia L. Brickell, of counsel.

## OPINION

GOETTEL, District Judge:

On December 5, 1983, Nordic Bank PLC London ("NBL"), a London bank, brought an action ("the Nordic action") in the United States District Court for the Eastern District of Pennsylvania naming the Trend Group Limited ("Trend"), Lease Trend Company ("Lease Trend"), William H. Klein and nine financial institutions as defendants. The action sought to cut off the security interests that the nine financial institutions allegedly had in automobile and equipment leases pledged to NBL by Trend and to recover monetary damages that arose from Trend's alleged default on certain promissory notes assigned to NBL.

On December 6, 1983, Trend, Lease Trend, and two of their affiliates, Serv Trend, N.V. ("Serv Trend") and Moss Vend Limited ("Moss Vend"), filed a fourteen count complaint in this Court against the plaintiff in the earlier action and against various related parties ("the Trend action").[1] On December 15, 1983, the Nordic action was transferred to this Court. The Nordic and Trend actions were subsequently consolidated.

On February 22, 1984, all of the defendants in the Trend action moved to dismiss that action. Before the motions could be heard, the Trend plaintiffs filed an amended complaint adding several counts and restating others. This complaint alleges seventeen causes of action. Seven arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–65 (1982). The complaint also states separate claims under the Bank Holding Company Act of 1970, 12 U.S.C. § 1972(1) (1982) ("BHCA") and under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). The remaining counts in the complaint state common law claims.

After the filing of the amended complaint in the Trend action, the parties to that action stipulated to extend the defendants' time to move or to answer for several months. As expected, the defendants again moved to dismiss a variety of claims on both substantive and jurisdictional grounds. Those motions are now before us.

## I. Background

### A. The Parties

Trend is a Delaware corporation that has its principal place of business in Valley

---

1. On January 20, 1984, this Court entered an order granting NBL's motion for a preliminary injunction and consolidating the Trend action with the Nordic action. This order also granted Trend's motion for summary judgment on NBL's claims against five of the nine financial institutions named as defendants in NBL's first amended complaint. The actions against the four other banking defendants have since been disposed of.

Forge, Pennsylvania. On July 11, 1978, Trend purchased the assets and name of Flourtown Leasing Company, which became Lease Trend. Plaintiff, Serv Trend, another wholly owned subsidiary of Trend, is a limited liability company organized under the laws of the Netherlands Antilles. Plaintiff, Moss Vend, is Trend's nominee in the United Kingdom.

Defendant, Nordic American Banking Corporation ("NABC"), is an investment company organized under Article 12 of the Banking Law of the State of New York, N.Y. Banking Law §§ 507–20 (McKinney 1971). Until August 31, 1979, NABC was wholly owned by defendant, Svenska Handelsbanken ("SHB"), a Swedish bank. On or about September 1, 1979, SHB sold 75% of its stock in NABC in equal shares to defendants Den Norske Creditbank ("DnC"), the largest commercial bank in Norway; Copenhagen Handelsbanken A/S ("CHB"), one of the largest banks in Denmark; and Kansallis Osake Pankki ("KOP"), a Finnish bank. Until approximately August 15, 1983, SHB, DnC, CHB, and KOP were also equal owners of defendant NBL, an international bank with its principal place of business in London, England. On August 15, 1983, DnC obtained control over all of the voting securities of NBL. NBL owns all of the stock of defendants Nordic Leasing Limited ("NLL") and Nordic Finance Limited ("NFL"), British limited liability corporations engaged in the equipment leasing business.

The complaint also names a number of individual defendants. These include Jan E.H.M. Ekman ("Ekman"), president of SHB and a Swedish citizen; Hans Christian Ostergaard ("Ostergaard"), a Danish citizen who, until December 31, 1980, was managing director of CHB; Erling Naper, ("Naper"), general manager of DnC and a Norwegian citizen; and Olli Kaila ("Kaila"), a Finnish citizen and a former executive vice-president of KOP. Commencing in September 1979, these four individuals served as directors of NABC. Ekman was Chairman of the Board until April 20, 1983. Naper and Ekman remain directors. Os-

tergaard resigned from the Board on April 3, 1981; Kaila did so in April 1983. John R. Nelson ("Nelson") and Michael S. Mathews ("Mathews"), NABC's president and the senior vice president, respectively, are also named as defendants. John R. Sclater ("Sclater"), a British citizen who is NBL's managing director and Steward G. Smith ("Smith"), its associate director, are similarly named.

### B. The Allegations of the Amended Complaint

The amended Trend complaint relates the following claimed pertinent facts.

### 1. The Flourtown Loans

On July 3, 1978, NABC loaned Trend $800,000 so that Trend could purchase the assets of the Flourtown Leasing Company ("Flourtown"), an automobile and equipment leasing company. On October 25, 1978, NABC loaned Trend an additional $600,000 for use as working capital. Between November 15, 1978 and May 10, 1979, NABC made nine loans aggregating $8,250,000 to Trend (or Flourtown) to finance automobile and equipment leases. NABC allegedly made several representations to Trend regarding these so-called "Flourtown Loans." NABC allegedly represented that Trend would only have to pay interest on the loans. Payments of principal would be due when the collateral was sold unless substituted collateral was pledged. NABC would charge interest at its prime rate, the rate charged its most credit-worthy customers. NABC also allegedly represented that its charter and the laws of New York authorized such loans and that the interest charges were lawful under New York law. Trend charges that each of these representations was false and known to be so when made.

In exchange for each Flourtown loan, Trend signed a full recourse, demand promissory note. On or about the time that NABC issued the last of the loans, it superseded the demand notes with partial recourse notes. NABC backdated these in-

struments to the dates of the original demand notes. The partial recourse notes obligated the lessees of the leases securing the loans. Trend asserts that NABC altered the structure of the loans so that it could represent that it had loaned funds to a variety of lessees instead of to Trend. In that way, NABC could avoid violating New York state's bank lending limits.

2. The Northern Telecom Portfolios

Beginning in March 1979, NABC financed Trend's purchase of several portfolios of operating leases from Data 100, a subsidiary of the Northern Telecom corporation ("Northern Telecom"). Trend completed the purchase of the first and second portfolios on March 20, and May 5, 1979, respectively. Although Trend signed full recourse demand instruments in exchange for the loans from NABC that financed these purchases, NABC allegedly represented that the loans would be partial recourse like the Flourtown loans.

On June 20, 1979, NABC agreed to finance Trend's purchase of an additional $30 million of Northern Telecom operating leases. In reliance on these assurances, Trend agreed to purchase at least $30 million of additional operating leases from Northern Telecom. In September 1979, SHB, NABC, NBL, and Trend met in Stockholm, Sweden, to discuss their continuing relationship. At those meetings, SHB, NABC, and NBL represented to Trend that they would organize a syndicate to finance Trend's purchase of $40 million of Northern Telecom operating leases, instead of the $30 million they had originally agreed to finance. NABC firmly committed to this undertaking. The syndication was to finance Trend's purchase of eight Northern Telecom lease portfolios. NABC, with the assistance of SHB and NBL, eventually supplied the financing for four such portfolios. However, portfolios numbered 7–10, valued at $22 million, which Trend had committed to purchase from Northern Telecom, remained to be financed.

During a meeting at NABC's offices in New York City on December 3, 1979, Nelson represented to Trend that if Trend agreed to waive NABC's firm commitment to complete the $40 million syndication, NABC would exercise its "best efforts" to complete the syndication and would attempt to enlist NBL's assistance in that endeavor. In reliance on these and other related representations, Trend waived NABC's firm commitment. Trend alleges that Nelson's representations were materially false and misleading. Immediately after Trend agreed, on December 8, 1979, to waive NABC's firm commitment, Trend notified NABC that it would be unable to fund the four remaining Northern Telecom portfolios before December 31, 1979.

Trend eventually funded Portfolio No. 7 itself, and resold numbers 8 and 9 to Northern Telecom.

At the September 1979 meeting, SHB also represented that SHB, NABC, and NBL would form a syndicate to finance the purchase of an additional $15 million in operating leases on equipment located outside of the United States. According to Trend, these representations were also materially false and misleading.

Of the four remaining Northern Telecom portfolios, Trend funded one itself, and resold two to Northern Telecom. In mid-December 1979, NBL allegedly agreed to fund the fourth remaining portfolio, numbered 10 ("Portfolio 10"), by year end. That portfolio was composed of United Kingdom operating leases that NABC had previously committed to fund.

In late December 1979, Trend allegedly incorporated Moss Vend, Inc. to act as its United Kingdom vehicle for financing Portfolio 10. In reliance on NBL's representations that financing for the purchase was imminent and under pressure from Northern Telecom to consummate the purchase, Trend caused Moss Vend to purchase that portfolio from Data 100 on December 31, 1979. NBL did not provide the promised financing. Instead, it demanded and received a number of concessions from Trend. On January 11, 1980, Trend acceded to NBL's demand that NFL, a subsidiary of NBL, purchase Portfolio 10. As

part of the same transaction, Trend agreed to convert SHB's firm commitment to organize a syndicate to provide $15 million in financing for European leases to a commitment to use its best efforts to provide such financing. In addition, at NBL's behest, Moss Vend executed a demand promissory note guaranteed by Trend in favor of NBL for the purchase price of the equipment. On June 27, 1980, Moss Vend finally sold Portfolio 10 to NFL, but not before Trend had agreed to pay 14,000 British pounds a month to NBL and to forego substantial tax benefits.

Beginning in January 1981, NABC, NBL, and their parent companies determined to improve their financial position vis-a-vis their relationship with Trend. For over a year, they attempted to reach a settlement with Trend that would realign and provide greater security for their outstanding loans. These efforts collapsed in March 1981, and on March 24, 1981, NABC demanded payment from Trend on all of its outstanding loans. NABC based its demands on the demand instruments that Trend had assertedly been superseded by partial recourse notes. *See supra* p. 549. Together with NBL and SHB, NABC also threatened to force Trend into bankruptcy, to notify its business associates, and to interfere with its relationship with Northern Telecom. In exchange for NABC's agreement to abstain from foreclosing on its demand notes—which Trend continued to insist were invalidly substituted for the partial recourse notes—Trend agreed to repay the Flourtown loans in full, and to repay loans made on portfolios 1–6 over a five year period. Trend also received an option to repurchase Portfolio 10. Trend agreed to a variety of other concessions. *See infra* pp. 552–53. On June 8, 1981, Trend consummated the settlement agreement with NABC. On that day, NBL purchased the Flourtown loans from NABC. In connection with that purchase, NABC endorsed, negotiated, and delivered demand promissory notes evincing those loans to NBL. In order to pay off the $23 million it owed NABC, Trend resold operating leases worth $35 million to Northern Telecom and received $30 million in return. Trend also obtained a $6 million letter of credit to guarantee repayment of the Flourtown loans and executed a new $3 million note in favor of NBL in exchange of the extinction of a similar obligation in favor of NABC.

## C. *The Amended Complaint*

The aforementioned allegations are the basis for the seven RICO claims in the amended complaint. The first of these claims charges that NABC knowingly misrepresented the nature of the original Flourtown loans to Trend. NABC's undisclosed intention to switch back and forth between its full and partial recourse notes is at the heart of this claim. This claim also charges that NABC knowingly misstated its intentions to charge Trend its "prime" rate of interest on the Flourtown loans and to comply with New York's banking laws.

The second RICO claim concerns NBL's alleged promise to pursue the $40 million syndication on a best efforts basis. According to Trend, NBL never intended to keep this promise. The third RICO count is quite similar. It alleges that SHB misrepresented its intention to arrange a syndicate to finance Trend's purchase of Northern Telecom's European lease portfolios.

The fourth RICO claim charges that NBL misrepresented its intention to finance the purchase of Portfolio 10 on the same terms as Trend's other Northern Telecom portfolios.

The fifth RICO claim charges NBL and NABC with fraudulently conspiring to cause Trend to agree to realign its obligations under the Flourtown loans from a partial recourse to a full recourse basis. The sixth RICO claim charges NABC, NBL, SHB, and their affiliates with extortionate conduct in extracting concessions from Trend during the spring of 1981. The final RICO claim alleges that NABC knowingly misstated its intention to charge Trend interest on the Flourtown loans at its "prime" rate. The thirteenth claim of

the amended complaint reasserts all but the sixth RICO claim as claims for common law fraud.

The eighth and ninth claims of the amended complaint attempt to assert claims under the Bank Holding Company Act and the Sherman Antitrust Act. Both assert that NABC unlawfully tied its agreement to stay enforcement of its demand for immediate repayment of the Flourtown and Northern Telecom loans to a variety of onerous economic conditions.

The tenth and eleventh claims seek rescission of Trend's sale of Portfolio 10 to NBL and of the agreements between Trend, NABC, and NBL signed during the spring of 1981 that realigned and stiffened Trend's obligations. The twelfth claim alleges that economic duress was improperly utilized to extract those concessions.

The fourteenth and sixteenth claims allege that SHB, NABC, and NBL tortiously interfered with Trend's contractual relationships with Northern Telecom, its subsidiaries, and affiliates (the fourteenth claim) and with Trend's subsidiaries and affiliates (the sixteenth count). The seventeenth count repleads the seventh RICO claim, the so-called "prime rate fraud," as a breach of contract claim. The fifteenth claim asserts that NBL breached its agreement to provide Trend an option to repurchase Portfolio 10.[2]

## II. *Discussion: The Substantive Motions*

Before the Court are a veritable cornucopia of motions. The defendants move to dismiss the RICO, BHCA, Sherman Act, economic duress, tortious interference, and breach of contract claims for failure to state a claim on which relief can be granted. In the alternative, they move to dismiss several of the common law claims for lack of subject matter jurisdiction. DnC and CHB and their associated officers move for summary judgment on the fraud claims against them. The defendants also attack the pleadings as vague and inadequate, and demand that the entire amended complaint be repled. Finally, DnC, KOP, CHB, Naper, Kaila, Ostergaard, Ekman, Sclater, and Smith move to dismiss the action for lack of personal jurisdiction.

### A. *The RICO Counts*

█ The defendants originally moved to dismiss each of the complaint's RICO counts. They asserted that the plaintiffs had not shown a distinct "racketeering injury" as required by *Sedima S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir.1984), *rev'd*, —— U.S. ——, 105 S.Ct. 3275, 87

**2.** The complaint names at least two defendants on all but one count. The following chart, which counsel for some of the defendants supplied the Court, lists each count and the defendants who are named on that count.

| Count | Nature of Claim | Defendants Charged |
| --- | --- | --- |
| First | RICO | NABC, SHB, CHB, KOP, DnC, Ekman, Ostergaard, Kaila, Naper, Nelson |
| Second | RICO | NABC, Nelson, Mathews |
| Third | RICO | Ekman, SHB |
| Fourth | RICO | NBL, NLL, NFL, Smith |
| Fifth | RICO | NABC, NBL, NFL, NLL, SHB, CHB, KOP, DnC, Ekman, Ostergaard, Kaila, Naper, Nelson, Mathews, Sclater, Smith |
| Sixth | RICO | NABC, NBL, SHB, Ekman, Sclater, Nelson, Mathews |
| Seventh | RICO | NABC, SHB, CHB, DnC, KOP, Ekman, Ostergaard, Kaila, Naper, Nelson |
| Eight | BHCA | NABC, NBL, SHB, DnC, CHB, KOP |
| Ninth | Sherman Act | NABC, NBL, SHB, DnC, CHB, KOP |
| Tenth | Rescission | NBL, NLL, NFL |
| Eleventh | Rescission | "NBL and NABC or any of their affiliates or subsidiaries" |
| Twelfth | Duress | NABC, NBL |
| Thirteenth | Common law fraud | "Defendants" |
| Fourteenth | Tortious interference with contract | SHB, NABC, Ekman, Nelson, Mathews |
| Fifteenth | Breach of contract | NBL, NLL, NFL |
| Sixteenth | Tortious interference with relationship with Hunter & Moss Vend | NBL, NLL, NFL |
| Seventeenth | Breach of contract | NABC |

L.Ed.2d 346 (1985), and *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir.1984), *vacated,* —— U.S. ——, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985). They also maintained that the plaintiffs had failed to establish another prerequisite to a civil RICO suit, a prior criminal conviction. *See Sedima S.P.R.L. v. Imrex Co., supra,* 741 F.2d at 496–504. Recently, the Supreme Court struck down both of these requirements. In *Sedima S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court found "no support in the statute's history, its language, or considerations of policy for a requirement that a private treble damages action under § 1964(c) can proceed only against a defendant who has already been criminally convicted." *Id.* at 3284. It also held that "[t]here is no room in the statutory language for an additional, amorphous racketeering injury requirement." *Id.* The Supreme Court's decision leaves the defendants with no substantive basis on which to rest a Rule 12(b)(6) motion to dismiss the RICO claims.[3] We therefore deem withdrawn the defendants' motion to dismiss those claims for failure to state a claim on which relief can be granted.[4]

### B. *The Bank Holding Company Act (BHCA) Claim*

The eighth claim in the amended complaint alleges that NABC violated those anti-tying provisions of the BHCA that provide,

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
> (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;
>
> (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;
>
> (D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company. . . .

12 U.S.C. § 1972(1)(B)–(D) (1982).[5] A successful plaintiff under BHCA § 1972(B)–(D) must allege and prove that a bank, a bank holding company, or its subsidiary (1) extended credit; (2) on the condition or requirement; (3) that its customer obtain or provide some additional credit, property or service.[6]

---

**3.** We note in passing that the plaintiffs appear to have stated a claim under RICO as it has been interpreted recently by the Supreme Court. "A violation of § 1962(c), the section on which [Trend] relies, requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). The complaint alleges at least five acts of "racketeering activity." *See* 18 U.S.C. § 1961(1) (1982). "A pattern of racketeering activity" is composed of two or more such acts. The definitions of "conduct" and "enterprise" appear to be satisfied as well. *Id.*

**4.** The plaintiffs' motion to dismiss the civil RICO claims without prejudice is also deemed withdrawn. The resuscitation of the RICO claims effectively disposes of the defendants' motion to dismiss the common law claims in the complaint for lack of subject matter jurisdic-

tion. This Court has pendent jurisdiction over those claims, which arise out of the same "common nucleus of operative facts" as the RICO claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**5.** Subsection (B) prohibits traditional tie-in arrangements. Subsections (C) and (D) prohibit reciprocal arrangements whereby a customer provides a bank with something of value in exchange for the bank's product or service. Another subsection prohibits exclusive dealing arrangements. 12 U.S.C. § 1972(1)(E) (1982).

**6.** Trend and Lease Trend brought their BHCA claim pursuant to section 1975 of that act which authorizes suits by "any person injured in his business or property by reason of anything forbidden in section 1972." 12 U.S.C. § 1975 (1982).

The thrust of Trend's[7] BHCA tying claim is that NABC conditioned its forbearance in collecting on its outstanding demand notes on the purchase by Trend of additional credit from NABC and NBL and on Trend's provision of various services to NBL and NABC. NBL and KOP, DnC, CHB, and SHB (collectively "the Nordic defendants") are alleged to have conspired with NABC to set up this tying arrangement. NABC allegedly forced Trend to obtain a $3 million loan from NBL in violation of § 1972(1)(b). NABC also allegedly required Trend to guarantee debts to NBL, to pay $175,000 in consulting fees and $110,000 in legal fees that NABC and NBL had incurred, and to provide $750,000 in substitute collateral to NBL. Trend also alleges that it signed an option to purchase Portfolio 10 at NABC's behest and endorsed certain of the Flourtown loans to NBL at NABC's behest, all in violation of § 1972(1)(d). Finally, Trend alleges that NABC violated § 1972(1)(c) by conditioning its forbearance on Trend's agreement to repay all of its outstanding loans to NABC, whether full or partial recourse, to shift the situs of the loans to NBL, to provide NABC with $6,000,000 in letters of credit, and to provide releases to NABC with respect to some of the Flourtown loans and the Northern Telecom transactions.

The defendants contend that Trend's pleadings do not assert any of the three prerequisites to a BHCA tying claim. We cannot agree. The papers before us establish that NABC "extended credit" within the meaning of the Act. Moreover, an issue of fact remains as to whether that extension was conditioned on Trend's agreeing to NABC's demands. The plaintiffs' claim is, however, flawed because most of the products, services, and consideration upon which NABC allegedly conditioned its forbearance cannot be the basis of a tying claim under the BHCA. Only Trend's claim that NABC tied its forbearance to Trend's agreement to guarantee two loans states a claim under the BHCA. Trend's other BHCA tying claims must be dismissed.[8]

### 1. Condition or Requirement

The defendants' argument that NABC did not "condition or require" its forbearance is easily disposed of. The parties have supplied contradictory affidavits regarding the extent of any coercion. *Compare* affidavit of William Johnson ¶ 17 ("It was Trend's decision and choice to turn to NBL to finance the Flourtown loans.") *with* affidavit of Jeffrey K. Rafsky ¶¶ 25, 44 ("Johnson contends that we freely chose to borrow from NBL to refinance certain of the Flourtown loans. This is blatantly untrue.... NABC did insist that the refinancing be done by NBL and no one else.... We did not 'choose' to borrow from NBL."). Except in one instance, the issue of whether NABC conditioned or required its forbearance cannot be resolved at this stage in the litigation.

The one exception is Trend's allegation that NABC forced it to sign an option agreement. This contention is absurd. An option agreement would provide Trend with a choice. It could either exercise the option or leave it be. Even at this early stage of the litigation, a claim that a litigant was coerced into signing an option agreement merits dismissal.

### 2. Extension of Credit

The defendants assert that NABC did not "extend credit" to Trend when it stayed enforcement of its demands for im-

---

**7.** Apparently, at some point, Trend and Lease Trend were joint obligors on the Flourtown loans. Consequently, they are named jointly in those counts charging fraud and other improper conduct with respect to those loans. In the interest of simplicity and brevity, the Court will refer to Trend and Lease Trend jointly as "Trend." From time to time, the Court will also address them as the plaintiffs.

**8.** Both parties buttressed their arguments on this motion with affirmations, affidavits, and other materials outside the pleadings. Consequently, we treat this as a motion for summary judgment pursuant to Fed.R.Civ.P. 56.

mediate repayment of the Flourtown loans. They contend that the BHCA's anti-tying provisions apply only when a bank makes its original loan, and not when the bank forbears from collecting on an existing loan. Although some of the BHCA's sparse legislative history supports the defendants' position, the underlying purpose of the anti-tying provisions and the entirety of the federal case law are to the contrary.

#### a. The Legislative History

"In 1956, Congress enacted the Bank Holding Company Act to provide for the regulation of the activities and acquisitions of companies controlling 25 percent or more of the stock of two or more banks." S.Rep. No. 1084, 91st Cong., 2d Sess. 1, *reprinted in,* 1970 U.S.Code Cong. & Ad. News 5519, 5520 [hereinafter "S.Rep."]. The anti-tying provisions in the Bank Holding Company Act Amendments of 1970, 12 U.S.C. §§ 1841–43, 1849, 1850, 1971–78 (1982), "prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." *Id.* at 5535. They thereby "provide specific statutory assurance that the use of economic power of a bank [will] not lead to a lessening of competition or unfair competitive practices...." *Id.* The anti-tying provisions were not, however, intended to interfere with or impede "appropriate traditional banking activities," *id.,* through which banks safeguard the value of their investment.

Nowhere does the legislative history or the language of the BHCA define the term "extension of credit." That term must be construed to accord with the underlying purpose of the anti-tying provisions. A particular practice should be considered an "extension of credit" if it manifests the improper use of economic leverage that the Act seeks to prevent. A bank's forbearance on the collection of a loan is such a practice. A bank can as easily tie the purchase of products or additional credit to its forbearance as it can to the purchase of a new loan.

Forbearance constitutes an extension of credit in a technical sense as well. By staying its demand for repayment, a bank continues to provide credit for the period of the stay.

The defendants cite the following passage from the legislative history as support for their position.

> The language of the bill makes clear that the *availability* to a *potential* customer *of any credit,* property, or service of a bank may not be conditioned upon that customer's use of any other credit, property, or service offered by the bank, the bank holding company or its subsidiary or by a business operated by one or more of the persons controlling the bank; upon the provision by such customer of any other credit, property, or service to the bank, the bank holding company or its subsidiary or to a business operated by one or more of the persons controlling the bank; or that the *potential* customer shall not obtain some other credit, property, or service from a competitor of the bank, the bank holding company or any other subsidiary, or from a competitor of a business operated by one or more of the individuals controlling the bank.
>
> The purpose of this provision is to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties *in order to obtain the bank product or service they desire.*

S.Rep. at 5535 (emphasis added). The defendants assert that the reference to "potential" customers indicates an intention to limit the reach of the anti-tying provisions. The second paragraph's reference to "bank customers," without mention of the word "potential," clarifies the first paragraph. Every customer, new or old, with whom the bank wishes to do additional business, is a potential customer. Logic suggests that Congress did not intend to forbid tying arrangements in certain first-time loan transactions and not in other transactions.

Rather Congress intended to reach improper tying arrangements in all of their manifestations.

### b. Case Law Precedents

Three federal courts have considered the meaning of the term "extension of credit" in the BHCA. In *Freidco v. Farmers Bank*, 499 F.Supp. 995 (D.Del.1980), one court concluded that a bank that had agreed to defer the payment of past-due obligations had "extended credit." According to that court,

> [a]n agreement to ... defer payment of an obligation is within the commonly accepted understanding of an extension of credit and an interpretation of the Act which would place such agreements beyond its scope would tend to frustrate the Congressional purpose. The potential for misuse of economic power by banks is at least as great when the customer is negotiating a "workout" and considering alternative means of refinancing as when a new loan is being sought.

*Friedco v. Farmers Bank*, 499 F.Supp. 995, 1001 (D.Del.1980) (footnote omitted) [hereinafter cited as *"Friedco"*]. In *Parsons Steel, Inc. v. First Alabama Bank*, 679 F.2d 242 (11th Cir.1982), the financially troubled plaintiff corporation alleged that the defendant bank, which had refinanced a loan to the plaintiff, had violated the BHCA's anti-tying provisions. The court characterized the issue before it as whether "a bank's requirement that financial control of an enterprise be placed in new hands when necessary to protect its investment before *extending further credit* [violated the BHCA's anti-tying provisions]." *Id.* at 244 (emphasis added). In framing the issue, the court implicitly held that the defendant had "extended credit" when it refinanced the loan. A situation nearly identical to the one *sub judice* confronted the Fifth Circuit in *Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir.1978). There, the Miami National Bank required two of the debtor corporation's stockholders to transfer 51 percent of their stock to another entity. In exchange, the bank

agreed to forebear from collecting on its loan to the corporation. In denying the defendant's summary judgment motion, the court implicitly held that such forebearance constituted an "extension of credit." These precedents unanimously support our conclusion that NABC "extended credit" to Trend when it agreed to forebear on its demand that Trend immediately repay any outstanding loans.

The lone federal authority cited by the defendants on this point, *Anderson v. Pamlico Chemical Co.*, 470 F.Supp. 12 (E.D.N.C.1977), is inapposite. In that decision, the court held that the readjustment of a debt was not an "extension of credit" within the meaning of § 24-11 of the North Carolina Retail Installment Sales Act, Chapter 25A, N.C.Gen.Stat. § 24-11. Relying on decisions of the North Carolina Supreme Court, the Court narrowly construed the North Carolina statute. That decision cannot influence our interpretation of the BHCA, a different federal statute with a broad legislative purpose.

■ Both the legislative history and judicial precedents counsel the same conclusion. By forbearing from collecting on its outstanding loans, NABC "extended credit" to Trend within the meaning of the BHCA. Unlike the "extension of credit" requirement, the requirement that there be some additional credit, property or service to which the extension is tied has been narrowly construed. To that requirement we now turn.

### 3. Additional Credit, Property, or Service

Both the language of the anti-tying provisions and the interpretation placed on that language by the courts limit the types of arrangements that the BHCA forbids. These limitations mandate the dismissal of the greater part of the BHCA claims in Trend's complaint. Nevertheless, Trend has stated a cause of action against NABC for allegedly tying the provision of two additional guarantees to its forbearance.

a. The Plain Language

■ The plain language of section 1972 forecloses several of Trend's BHCA claims. For example, the section's requirement that an extension of credit be conditioned on the purchase or provision of some *additional* credit defeats Trend's claim with respect to the $3 million loan that NABC allegedly forced Trend to obtain from NBL. Both parties agree that this was not a provision of new credit but rather a replacement for part of Trend's outstanding debt to NABC.

■ Another of section 1972's unambiguous requirements is that the tied credit, service, or property be provided to or obtained from a bank, its holding company, or a subsidiary of that holding company. Several of the ties identified by Trend are not of this sort. The alleged requirements that Trend pay NABC's legal fees and NBL's consulting fees fall victim to this infirmity. Neither NABC nor NBL provided these services to Trend, and Trend did not obtain these services. Instead, NABC and NBL obtained the services, then allegedly coerced Trend into footing the bill. Such an arrangement may be coercive, improper, and perhaps unlawful, but it is not proscribed by the BHCA.

■ Likewise, the BHCA provides no recourse to Trend on its complaints regarding the alteration of certain obligations from partial to full recourse, the provision of certain releases, and the shifting of the situs of certain loans. NABC may have forced these changes in the terms of Trend's outstanding obligations, but the BHCA does not address such changes. It addresses the tying together of additional credit, property, or services to the extension of credit. It does not forbid changes in the terms upon which the credit is extended.

b. Traditional Banking Practices

■ It is now established federal law that the BHCA's anti-tying provisions do not interfere with appropriate traditional banking practices.[9] *B.C. Recreational Industries v. First National Bank, N.A.,* 639 F.2d 828, 832 (1st Cir.1981); *McCoy v. Franklin Savings Association and Mortgage Management Co.,* 636 F.2d 172, 175 (7th Cir.1980), *Clark v. United Bank,* 480 F.2d 235, 238 (10th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973). A bank's attempt to protect its investment by requiring that a borrower purchase or provide something usually provided in connection with a loan does not violate the BHCA. A bank may require a debtor in a precarious financial position to employ a full-time business advisor designated by the bank, *B.C. Recreational Industries v. First National Bank, supra,* 639 F.2d at 832, to release financial control to an individual designated by the lender, *Tose v. First Pennsylvania Bank, N.A.,*

**9.** The defendants do not discuss the traditional banking practices defense. Instead, they assert that the plaintiffs must establish an "anti-competitive effect" in order to state a claim under the BHCA's anti-tying provisions. This terminology is confusing. The term "anti-competitive" derives from the BHCA's legislative history, *see* S.Rep. No. 1084, 91st Cong., 2d Sess. 1, *reprinted in,* 1970 U.S.Code Cong. & Ad.News 5519, 5535 [hereinafter "S.Rep."] ("The purpose of the provision is to prohibit anti-competitive practices...."), and from opinions construing the BHCA, *see, e.g., Rae v. Union Bank,* 725 F.2d 478, 480 (9th Cir.1984) ("The plaintiff must show an anti-competitive tying arrangement."). This language notwithstanding, the BHCA does not require a plaintiff to prove that the arrangement in question had an anti-competitive effect. Instead, the BHCA establishes a *per se* rule obviating the need for a specific inquiry into the anti-competitive effect of the prohibited tie. *Costner v. Blount National Bank,* 578 F.2d 1192, 1194 (6th Cir.1978); *Parsons Steel, Inc. v. First Alabama Bank,* 679 F.2d 242, 244–45 (11th Cir. 1982); Naegele, *The Anti-Tying Provision: Its Potential Is Still There,* 100 Banking L.J. 138, 143 (1983) ("In contrast to the general antitrust laws, Section 1972 imposes treble damage liability without a showing that the bank, bank holding company or its subsidiary has sufficient economic power in the market for the tying product to impose a tying arrangement."). *See also* S.Rep. at 5558 (Supplementary Views of Edward W. Brooke). ("[T]ying arrangements involving a bank are made unlawful by [the BHCA] without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service.")

648 F.2d 879, 897 (3d Cir.) *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), or to maintain interest-free deposits with the lender, *Clark v. United Bank, supra,* 480 F.2d at 238.[10]

 Several aspects of the transaction at issue constituted traditional banking practices that are exempt from the BHCA's anti-tying provisions. NABC's alleged demand that Trend substitute $750,000 in new collateral for leases that NBL deemed uncreditworthy is exempt as is NABC's alleged demand that Trend agree to provide collateral equal to 120 percent of the value of any outstanding loans. *See Freidco, supra,* 499 F.Supp. at 1002 (requirement that customer provide additional collateral to secure a loan did not violate BHCA). Likewise, NABC did not violate the BHCA when it required Trend to provide it with a $6 million dollar letter of credit in order to ensure repayment of its outstanding loans. This requirement was well within the bounds of ordinary banking practice.

### c. The Tampa Transportation and Valley Dairy Guarantees.

 The aspect of the transaction at issue that gives us the most pause is the alleged requirement that Trend guarantee $250 thousand in loans to NABC. NABC allegedly forced Trend to guarantee $100 thousand of Tampa Transportation's indebtedness to NABC and to guarantee all of the obligations that Valley Dairy had incurred with NABC. Although it may later appear that these guarantees were simply designed to preserve the value of NABC's investment, the court cannot now say that this was the case and that Trend has not stated a claim under section 1972

of the BHCA with regard to these guarantees.

*Costner v. Blount National Bank,* 578 F.2d 1192 (6th Cir.1978), addressed a similar arrangement. The plaintiff, Costner, obtained a $420,000 personal loan for the purpose of buying back the outstanding stock of an automobile dealership in which he held a majority interest. The agreement required his corporation to sell a substantial share of its retail commercial automobile installment paper to the bank. Costner asserted that this aspect of the loan agreement violated the BHCA. On appeal, the bank conceded that the condition violated section 1972. The court impliedly agreed. The alleged requirement that Trend guarantee several loans for which it was not already responsible constituted a similar imposition on Trend unrelated to NABC's extension of credit. *Costner* supports our current view that the plaintiffs have stated a BHCA claim.

### 4. The Claims Against NBL and the Nordic Defendants

 Trend attempts to implicate NBL, CHB, DnC, KOP, and SHB [the latter four banks are referred to hereinafter as "the Nordic defendants"] as conspirators in NABC's tying scheme. Although the Court cannot now rule out a conspiracy, we cannot permit the BHCA claims against these defendants to go forward. The anti-tying provisions of the BHCA prohibit conduct by banks, which the Act defines as "institution[s] organized under the laws of the United States, any State of the United States, [or any territory]." 12 U.S.C. § 1841 (1982). Although two of the defendant banks operate in the United States, those operations are unrelated to the ties alleged herein. In these circumstances, no

---

**10.** The plaintiffs contend that these cases, which concern alleged violations of section 1972(1)(C), are inapposite because most of the claims herein arise under subsections (B) and (D). No doubt these subsections differ in effect. While (B) and (D) prohibit a bank from tying the extension of credit to property or services offered by a bank holding company or to a subsidiary of that company, subsection (C) prohibits a bank from tying two or more products or ser-

vices together. However, except for one phrase in subsection (C) that permits banks to tie together certain products and services, the language of the three subsections is identical. Moreover, the same policies underlie each subsection. The cited cases are among the only authority construing section 1972(1) and are persuasive with regard to each of that section's subsections.

claim may be brought against any of the defendant banks under the BHCA; all such claims are dismissed.

### C. *The Sherman Act Claim*

The ninth claim in the amended complaint charges NABC, NBL, and the Nordic defendants with engaging in an illegal tying arrangement, a *per se* violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). The identical facts form the basis of Trend's antitrust and BHCA claims. Neither the pleadings nor the numerous affidavits that accompany them contain facts sufficient to constitute a claim under section 1 of the Sherman Act.[11]

██ A plaintiff must allege and prove four elements to state a *per se* tying claim under the antitrust laws. These are: (i) separate tying and tied products; (ii) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (iii) sufficient economic power in the tying product market to restrain trade in the market for the tied product; and (iv) involvement of a not insubstantial amount of interstate commerce in the tied product market. *Konik v. Champlain Valley Physicians Hospital Medical Center,* 733 F.2d 1007, 1017 (2d Cir.1984). "[A] tie-in analysis begins with the question of separability—the requirement that the tying and tied products be different, or, stated simply, that the forced purchase be of a second distinct commodity." *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 280 (2d Cir.1967). In *Jefferson Parish Hospital v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) [hereinafter *"Jefferson Parish"*], the Supreme Court reiterated that "a tying arrangement cannot exist unless two separate product markets have been linked." *Id.* at 1562–63.

The requirement that two distinguishable product markets be involved follows from the underlying rationale of the rule against tying. The definitional question depends on whether the arrangement may have the type of competitive consequences addressed by the rule. The answer to the question whether petitioners have utilized a tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying—that petitioners have foreclosed competition on the merits in a product market distinct from the market for the tying item.

*Id.* at 1563.

██ Over the course of the tortured practice on this motion, the plaintiffs have stubbornly attempted to identify separate tying and tied product markets. Their efforts have failed. Initially, the plaintiffs stated, "[t]he tying product alleged, the forebearance or [sic] further extension of credit on the Flourtown loans by NABC, ... is distinct from the tyed [sic] product, the taking of a loan from NBL in the amount of $3,199,394.33, together with assuming certain obligations to NBL and fees owing by it." Plaintiffs' Memorandum in Opposition at 67. This statement identified one tying product, the forebearance on extension of credit, and two sets of tied products, the $3 million loan from NBL and the other obligations and fees that form the basis of Trend's BHCA claim, *see supra* pp. 552–53.

No one disputes that when NBL extended the new, $3 million loan to Trend, that loan in fact substituted for part of NABC's original Flourtown loans to Trend. If, indeed, the tying product impacted on any market (there is no market for "forbearance"), that market was the market for the kind of credit that the Flourtown loans constituted.[12] Trend attempted to address

---

11. Given the presence of affidavits and other matters outside of the pleadings, the Court treats this motion to dismiss as one for summary judgment. *See supra* note 8.

12. The plaintiffs cite *Bass v. Boston Five Cent Savings Bank,* 478 F.Supp. 741, 746–47 (D.Mass.

1979) and *Stavrides v. Mellon National Bank & Trust Co.,* 353 F.Supp. 1072, 1076 (W.D.Pa.), *aff'd,* 487 F.2d 953 (3d Cir.1973), to support their contention that the tying and tied markets differ. Those cases refused to dismiss Sherman Act claims alleging that a bank improperly tied the provision of mortgage financing to the

this defect in its tying claim by supplying a belated affidavit characterizing the market for the tied product as the automobile resale market. Affidavit of Steven P. Rogers, March 29, 1985 at ¶ 11. This assertion cannot alter our holding. However characterized, the initial Flourtown loans and the $3 million loan that NBL eventually assumed impacted on the same credit market. NABC forebore in collecting on its demand instruments. The later loan was also a demand instrument. Both loans looked to Trend, not to the lessees, as obligor. Whatever their character, they involved the same market for credit. One could not be tied to the other.

Trend's claim that NABC tied "additional obligations and fees," complaint ¶ 318, to its forbearance is also defective. Trend asserts that it would not have assumed these "additional obligations and fees" had NABC not forced it to do so. According to the Supreme Court,

> when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

*Jefferson Parish, supra,* 104 S.Ct. at 1560. This language dooms the second aspect of Trend's antitrust tying claim. Moreover, Trend cannot state a claim involving the second set of tied products because it has not, and cannot, identify a market for any of these "additional" products. None is, in fact, a product.

Trend's antitrust tying claims fail for other reasons. Trend has not identified a tying product. Rather, NABC is alleged to have conditioned its forbearance on purchases from NBL. Although the BHCA

prohibits the use of forbearance as a means of coercion, *see supra* pp. .554–56, we have not been cited to any authority that classifies forbearance as a tying product within the meaning of the anti-trust laws. The "single purchaser rule" articulated in *Jefferson Parish* also dooms Trend's antitrust claim. According to that rule, "[i]f only a single purchaser [is] 'forced' with respect to the purchase of a tied item, the resultant impact on competition [is] not ... sufficient to warrant the concern of anti-trust law." *Jefferson Parish, supra,* 104 S.Ct. at 1560. Trend, a single purchaser, was allegedly forced to purchase various tied items. The harm done to it in that capacity is not cognizable under the anti-trust laws.

The general rule that summary judgment should be used sparingly in anti-trust cases does not mean that summary judgment should never be used in such cases. Awarding of summary judgment in antitrust cases in which there was "no genuine issue as to any material fact," has found approval in the Supreme Court and in this circuit.... Summary judgment is particularly appropriate where, as in the instant case, there has already been extensive discovery.

Of course, in order to prevail on their motion for summary judgment, the defendants, as the moving party, must show there is "no genuine issue as to any material fact" and that they are "entitled to judgment as a matter of law."

*Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1174 (S.D.N.Y.1981), *aff'd,* 671 F.2d 91 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982) (citations omitted). The moving defendants have met this difficult burden [13] and are

---

maintenance of an escrow account. The tying and tied products identified herein are hardly so distinct.

13. In its last set of sur-reply papers, Trend suggested that—should its *per se* claim fail—it could, nevertheless, state a claim under a "rule of reason" analysis. Every plaintiff who asserts

a tying claim, whether *per se* or rule of reason, must establish the existence of distinct tying and tied products. *Jefferson Parish Hospital v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). Because the plaintiffs have failed in this regard, their rule of reason claim cannot survive.

entitled to summary judgment on the ninth count of the amended complaint.[14]

### D. *Business Compulsion Duress*

The twelfth cause of action purports to state a claim against NABC and NBL for "business compulsion duress." It alleges that NABC and NBL unlawfully pressured Trend to accept the concessions that underlie the tying claims, *see supra* pp. 552–53. NABC and NBL contend that, under New York law, one of the essential elements of such a claim is that the victim's actions be "precipitated solely by duress and without hope of personal gain." *United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419, 430 (S.D.N.Y.1982). They then argue that, since Trend received an option to buy back Portfolio 10 in exchange for its concessions, it cannot state a claim for duress.

The defendants mischaracterize New York's law of "business compulsion duress." Despite the "without hope of personal gain" language in *United States v. Wallace & Wallace Fuel Oil Co., supra*, the overwhelming majority of courts apply a different standard in duress cases. The majority view is that a claim for rescission and damages lies when a party is compelled to agree to a contract term or terms because a wrongful threat by another party precludes the exercise of its free will.[15] *805 Third Avenue Co. v. M.W. Realty Associates*, 58 N.Y.2d 447, 448 N.E.2d 445, 447, 461 N.Y.S.2d 778, 780 (1983); *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 272 N.E.2d 533, 536, 324 N.Y.S.2d 22, 25 (1971); *Podmore v. Our Lady of Victory Infant Home*, 82 A.D.2d 48, 442 N.Y. S.2d 334 (4th Dep't 1981). Judge Edelstein applied this standard in an analogous case, *Citibank, N.A. v. Real Coffee Trading Co. N.V.*, 566 F.Supp. 1158 (S.D.N.Y.1983). There, he held that a borrower could state a claim for business compulsion duress against a bank that had allegedly extracted certain concessions in exchange for forbearing on an allegedly improper demand for payment. Sound policy also favors the "free will" formulation. Under the *Wallace & Wallace* test, the presence of token consideration precludes a duress claim. But it does not preclude duress. A raw deal is a raw deal, whether it includes some or no benefit to the party of whom advantage is taken. The better approach, the free will test, examines the transaction in its entirety.

■ The plaintiffs have pled every element of a claim for business compulsion duress. They have alleged that NABC wrongfully threatened them with foreclosure and then exchanged its forbearance in return for valuable consideration. Trend alleges that it was in no position to litigate the propriety of the threat since, without NBL and NABC's cooperation, it could not resell the Northern Telecom portfolios. Trend has thus alleged facts that, if proven, would indicate that it was compelled to act against its free will. The motion to dismiss the twelfth cause of action is denied.

### E. *Tortious Interference with Contractual Relations*

■ The amended complaint's fourteenth and sixteenth claims are for tortious interference with contractual relations. The named defendants move to dismiss both of these counts for failure to state a claim on which relief can be granted. It is the settled law of New York and of the courts of this district that four elements comprise a claim of tortious interference with contractual relations. These are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a breach of the contract by the third party;

---

**14.** Since whether Trend was coerced to accept the realignment is not dispositive on either the BHCA, *see supra* pp. 553–54, or antitrust claims, the plaintiffs are not entitled to a stay of our decision on those issues pending further discovery on the issue of coercion.

**15.** Even if the law were that stated in *United States v. Wallace and Wallace Fuel Oil Co.*, 540 F.Supp. 419, 430 (S.D.N.Y.1982), an issue of fact would remain as to whether Trend could have hoped to gain anything from the option agreement.

and (4) damages caused by the breach." *Strobl v. New York Mercantile Exchange,* 561 F.Supp. 379, 386 (S.D.N.Y.1983) (MacMahon, J.); *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D. N.Y.1983); *Hammerhead Enterprises, Inc. v. Brezenoff,* 551 F.Supp. 1360 (S.D.N. Y.1982), *aff'd,* 707 F.2d 33 (2d Cir.1983), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1984); *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 134 N.E.2d 97, 101, 151 N.Y.S.2d 1, 5 (1956); *Bryce v. Wilde,* 39 A.D.2d 291, 333 N.Y.S.2d 614, 616 (3d Dep't 1972), *aff'd,* 31 N.Y.2d 882, 292 N.E.2d 320, 340 N.Y.S.2d 185 (1972). In the one case that applied a different test, Judge MacMahon stated,

> It is not necessary, as plaintiff erroneously argues, to allege a breach of contract in order to state a valid claim for interference with contractual relations. The tort extends to cases in which performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions. In New York, "an unlawful interference with a person in the performance of his contract with a third party is just as much a legal wrong as is an unlawful inducement of a breach of that contract by the third party."

*Goodall v. Columbia Ventures, Inc.,* 374 F.Supp. 1324, 1332 (S.D.N.Y.1974) (footnotes omitted). Not only is the wealth of recent authority to the contrary, but Judge MacMahon himself has recently adhered to the current formulation. *See Strobl v. New York Mercantile Exchange, supra.*

The fourteenth claim asserts that NABC, together with SHB, Ekman, Nelson, and Mathews, tortiously interfered with Trend's relationship with Northern Telecom. The complaint fails to allege several of the elements necessary to state a claim for tortious interference with contractual relations. Although paragraph 355 of the complaint vaguely alludes to Northern Telecom's contractual commitment to provide Trend with $40 million in operating portfolios, nowhere does the complaint allege whether or how Northern Telecom breached that commitment, or whether and how any of the named defendants procured a breach of that commitment.

The amended complaint's sixteenth cause of action alleges that from December 1983, to date, NBL, NLL and NFL tortiously interfered with Trend's relationship with Moss Vend. Although the amended complaint refers to the Trend-Moss Vend relationship, it does not refer to a contract. Moreover, the amended complaint does not allege or otherwise indicate that the defendants knew of any Trend-Moss Vend contract. The fourteenth and sixteenth claims must be dismissed for failure to state a claim on which relief can be granted.

### F. *The Breach of Contract Claims*

Trend's fifteenth and seventeenth claims are for breach of contract. The named defendants move to dismiss both of these counts for failure to state a claim on which relief can be granted. They also move for summary judgment on the latter.

The elements of a claim for breach of contract are (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages. *See Stratton Group, Ltd. v. Sprayregen,* 458 F.Supp. 1216 (S.D.N.Y. 1978). Each element need not be separately pled. All that is necessary is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2).

### 1. The Fifteenth Claim: The Option Agreement and "Side Letters"

A close reading of Trend's opposition papers reveals that the fifteenth count alleges not one but three breach of contract claims. The first, alleging breach of the Portfolio 10 option agreement, fails to state a claim for relief. Trend asserts that NBL breached the option agreement when it unilaterally modified that agreement by inserting additional terms and conditions that undermined the consideration bar-

gained for by Trend. Plaintiffs' Memorandum of Law in Opposition at 96. This contention cannot form the basis for a successful breach of contract claim. It bears only on the terms of the agreement. Nowhere does Trend allege any facts that indicate if or how NBL breached the option agreement.

 Trend also alleges that NBL, NLL, and NFL breached certain "side letter" agreements. The amended complaint's only reference to these "side letters," complaint ¶ 369, which are appended thereto as exhibit O, is a bald allusion to their breach. That conclusory allegation provides insufficient notice of the facts underlying a breach of contract claim. It is no answer to assert, as Trend does, that it is "disingenuous for NBL, NLL, and NFL to claim ... that they are unaware what terms are claimed to have been breached." Plaintiffs' Memorandum in Opposition at 95–96. Litigation should not be a guessing game.

That part of the fifteenth claim that alleges a breach of the option agreement must be dismissed for failure to state a claim upon which relief can be granted. The remainder of that count is dismissed as inadequately pled. Since this is Trend's first attempt at pleading such claims, the plaintiffs may replead their "side-letter" claims within 30 days.[16]

2. The Seventeenth Claim: The Prime Rate Breach

 By the seventeenth claim in its amended complaint, Trend seeks to recover damages from NABC for breaching various agreements to charge Trend the "prime" rate of interest charged NABC's best and most creditworthy customers. NABC moves for summary judgment on this claim. According to NABC, the operative demand instruments governing its loans to Trend provided that NABC would charge Trend interest at NABC's "base rate," a higher rate than its "prime rate." NABC asserts that it always charged Trend interest at this rate. Johnson Affidavit ¶¶ 21–30. Trend's story differs. It argues that the operative partial recourse notes are silent with respect to the applicable rate of interest. According to Trend, these notes provided for interest payments at NABC's "best rate," the rate charged its most substantial commercial borrowers. Amico Affidavit ¶ 21. *See also* Rafsky Affidavit ¶ 12 ("The operative provisions regarding interest on the Flourtown loans are those 'prime rate' or 'best rate' representations made by NABC's officers....").
The Court cannot now determine which interest rate provisions governed the loans that are the subject of Count 17.[17] Even if the Court could adopt NABC's assertion that its "base rate" was applicable in all cases, summary judgment would be inappropriate because NABC has not conclusively established that it charged NABC the "base rate." NABC's motion for summary judgment on the seventeenth claim is, therefore, denied.[18]

G. *The Pleadings*

The defendants also ask the Court to require the plaintiffs to file a second amended complaint that separately states each claim of common law fraud and otherwise complies with Fed.R.Civ.P. 8. We

---

**16.** The defendants objected to the breach of contract claims on the ground that the plaintiffs' performance is not pled. Rule 9(c) of the Federal Rules of Civil Procedure provides that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred." Fed.R.Civ.P. 9(c). The remaining breach of contract claims should be repled to include this general allegation, if truthful.

**17.** The affidavit of William Johnson supplies NABC's entire argument on the seventeenth count. Johnson became an NABC employee in June 1979, after most of the loan agreements that are the subject of the seventeenth count had been consummated. Johnson has no first-hand familiarity with those loans and cannot competently discuss NABC's intent respecting their provisions.

**18.** We note also that the seventeenth count adequately pleads a breach of contract claim. NABC's objections to this count based on the adequacy of the pleadings are meritless. *See supra* p. 561.

construe this entreaty as a motion pursuant to Fed.R.Civ.P. 12(e) for a more definite statement.

The amended complaint is a prolix narrative that often defies comprehension. Unfortunately, the Court's every effort to encourage the plaintiffs to clearly and concisely present their claims and arguments in this action has met with little success. Nevertheless, at the risk of further frustration, the Court will try once again to promote clarity.

■ In the Court's view, the plaintiffs have pleaded their fraud claims in an incorrect manner. They should plead their common law fraud claims as separate counts. Since they need not plead each fraud claim as a separate RICO claim, but must rather plead a "pattern of racketeering activity" composed of two or more predicate acts, they may plead the RICO claim as a single claim (or as multiple claims, if necessary in order to differentiate among defendants). The pleadings should include the necessary allegations concerning use of the wires (wire fraud).

Wherever possible, the defendants should endeavor to simplify and clarify the remainder of their pleadings. They should plead separate counts separately. However, they may not plead new counts nor may they replead counts that the Court has dismissed. Any new or previously dismissed claims will be dismissed *sua sponte.* The repleaded complaint should facilitate the defendants' answer, the Court's understanding, and the parties' discovery, and

should comply with all other directives in this opinion.

### III. *Discussion: The Motions to Dismiss for Lack of Jurisdiction*

Many of the defendants move to dismiss the claims against them pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. These defendants include three of the Nordic banks; DnC, CHB, and KOP, and their respective officer defendants; Naper, Ostergaard, and Kaila. Although SHB does not challenge the Court's *in personam* jurisdiction, its president, Jan Ekman, does. Stewart Smith and John Sclater, both English citizens and NBL's associate director and managing director, respectively, also challenge the Court's jurisdiction.

> The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff. Until an evidentiary hearing is held, however, the plaintiff need make only a prima facie showing that jurisdiction exists, and this remains true notwithstanding a controverting presentation by the moving party. In the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff, and where doubts exist, they are resolved in the plaintiff's favor.

*Hoffritz For Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985) (citations omitted).[19] In deciding these pretrial motions to dismiss for lack of personal jurisdiction, we have considerable procedural leeway.

**19.** This standard appears at odds with Judge Winter's statement in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117 (2d Cir.1984) [hereinafter *"Beech Aircraft Corp."*]. There, Judge Winter wrote:

> [A] plaintiff must demonstrate by a preponderance of the evidence that *in personam* jurisdiction exists. It is true that, when the issue is decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case. However, if that initial decision is contested, the plaintiff must then prove, following discovery, either at a pre-trial hearing or at trial, that jurisdiction exists by a preponderance of the evidence. Given

that the district court permitted substantial discovery, VW must now be held to the preponderance burden.

*Id.* at 120 (citations omitted). If, indeed, this statement is inconsistent with that in *Hoffritz For Cutlery, Inc. v. Amajac, Ltd.,* the Court chooses to follow the latter which is both more recent and consistent with a long line of Second Circuit and Southern District pronouncements regarding the manner of resolving the issue of personal jurisdiction. Although personal jurisdiction must eventually be established by a preponderance of the evidence, the Court has discretion in determining when to require such a showing.

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). In exercising this flexibility, we permitted substantial discovery on the jurisdictional issues raised by these motions. The affected parties have proffered numerous affidavits, documents, and depositions to support their positions. However, we have foregone an evidentiary hearing.

Since the complaint fails to state a claim under the Sherman Act and under the BHCA against any of the moving defendants, RICO is the only federal statute that might authorize the Court to exercise personal jurisdiction over the movants. In addition, the law of New York—the state in which this Court sits—supplies another possible basis for the assertion of personal jurisdiction over the moving defendants. *Arrowsmith v. United Press International*, 320 F.2d 219 (2d Cir.1963). None of these bases, however, avails the plaintiffs. The actions against the moving defendants must be dismissed.

### A. *Jurisdiction Under RICO*

Section 1965 of RICO, 18 U.S.C. § 1965(b) (1982), authorizes nationwide service of process in civil RICO actions. *See* H.Rep. No. 91–1549, 1970 U.S.Code Cong. & Admin.News 4007, 4034 ("[Section 1965(b)] provides nationwide service of process on parties, if the ends of justice require it, in actions under section 1964."). These service provisions have consistently been construed as extending the courts' jurisdiction over civil RICO actions to the limits of due process. *Lopez v. Richards*, 594 F.Supp. 488, 493 (S.D.Miss.1984); *Soltex Polymer Corp. v. Fortex Industries, Inc.*, 590 F.Supp. 1453, 1458 (E.D.N.Y.

1984); *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1087–88 (D.Del.1984); *Hodgdon v. Needham-Skyles Oil Co.*, 556 F.Supp. 75, 77 (D.D.C.1982).[20] "Although RICO authorizes nationwide service of process, it does not, by its very language, authorize service in a foreign country." *Id.* (and authorities cited therein). Since effective service is a prerequisite to the exercise of jurisdiction, any foreign party against whom a RICO claim is asserted must be served with process in this country. The plaintiffs have not served Ekman, Kaila, Ostergaard, Naper, Smith, Sclater, CHB, or KOP here.[21] The Court cannot exercise personal jurisdiction over these foreign parties under RICO.

On April 1, 1985, the plaintiffs attempted to serve DnC at its office in Houston, Texas. That service was both untimely—well after the 120 day period after filing of the complaint within which service may be made, Fed.R.Civ.P. 12(h)—and defective, in that the original complaint was served. After an amended complaint has been filed, service of the superseded original complaint is inappropriate. *Phillips v. Murchison*, 194 F.Supp. 620, 622 (S.D.N.Y.1961). "Where service of process is insufficient, '[t]he courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant....'" *Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir.1985) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1354, at 585 (1969)). Accordingly, the RICO action against DnC is dismissed. RICO will not supply a basis for exercising jurisdiction over any of the moving defendants.

---

**20.** The courts have long held that the Sherman Antitrust Act's nationwide service provisions, 15 U.S.C. § 78aa (1982), extend the courts' personal jurisdiction to the boundaries of the United States, the due process clause being the only constraint. *See, e.g., Mariash v. Morrill*, 496 F.2d 1138, 1142–43 (2d Cir.1974). The Court's interpretation of RICO's similar provisions, *see* H.Rep. at 4034 ("Section 1965 contains broad provisions regarding venue and process, which are modeled on present antitrust legislation."), is consistent with these precedents.

**21.** The parties do not appear to question the fact that Ekman, Kaila, Ostergaard, Naper, CHB, and KOP have not been served with process in this country. However, the papers do not indicate whether Smith or Sclater were ever served in the United States. If the plaintiffs can establish that they were timely and properly served in this country, the Court will assess its jurisdiction over the two NBL officials.

B. *Jurisdiction Under New York Law*

The remaining bases of jurisdiction are CPLR § 301, N.Y.Civ.Prac. § 301 (McKinney 1972), which incorporates the common law bases of jurisdiction into the Civil Practice Law, and CPLR § 302, N.Y.Civ.Prac. Law § 302 (McKinney 1972), New York's long arm statute.

### 1. The Corporate Defendants

#### a. CPLR § 301: Doing Business

"A non-resident defendant ... subject[s] itself to the personal jurisdiction of a New York court [under CPLR § 301] ... if it does business in this State." *Pneuma-Flo Systems, Inc. v. Universal Machinery Corp.*, 454 F.Supp. 858, 862 (S.D.N.Y.1978). "The test, though not 'precise' is a 'simple pragmatic one': is the aggregate of the corporation's activities in the State such that it may be said to be 'present' in the State 'not occasionally or causally, but with a fair measure of permanence and continuity....?'" *Laufer v. Ostrow*, 55 N.Y.2d 305, 434 N.E.2d 692, 694, 449 N.Y.S.2d 456, 458 (1982) (citations omitted). The plaintiffs contend that DnC, CHB and KOP are doing business in New York within the meaning of CPLR § 301.

DnC, KOP, and CHB exhibit few of the classic indicia of doing business in New York. They are not licensed to conduct business in the state, maintain no local office, possess no New York property, and do not have local telephone numbers. *See Pneuma-Flo Systems, Inc. v. Universal Machinery Corp., supra,* 454 F.Supp. at 861 (listing classic indicia). The plaintiffs, nevertheless, contend that the moving defendants' sales of large quantities of commercial paper through New York agents and their collective ownership of the stock of two New York corporations each support a finding that the three Nordic defend-

ants are doing business in New York within the meaning of CPLR § 301.

■ The plaintiffs seek to attribute to each defendant the contacts of the New York corporations in which they hold an interest. CHB, KOP, and DnC each own 25% of NABC's stock. Collectively, the three also control 75% of Commercial Funding, Inc., a New York company engaged in equipment financing. However, we may only ascribe the New York contacts of NABC or Commercial Funding, Inc. to KOP, DnC, and CHB if the former are shown to be mere departments or agencies of the latter. *Bialet v. Racal-Milgo, Inc.,* 545 F.Supp. 25, 31–32 (S.D.N.Y.1982); *Blount v. Peerless Chemicals (P.R.) Inc.,* 216 F.Supp. 612, 615 (E.D.N.Y.1962), *aff'd,* 316 F.2d 695 (2d Cir.), *cert. denied,* 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). A subsidiary relationship or common stock ownership is a threshold minimum to such a finding. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984); *Grove Valve & Regulator Co. v. Iranian Oil Services, Ltd.,* 87 F.R.D. 93, 95 (S.D.N.Y.1980). Because ownership of NABC is divided among four different foreign banks, the identity of interests that these precedents require is manifestly lacking. Although there is some evidence to suggest that, by virtue of their common ownership, KOP, DnC, and CHB exercised some extremely limited control over NABC, any influence falls far short of the necessary finding that the control was "so complete that [NABC was], in fact, merely a department...." *Delagi v. Volkswagenwerk AG,* 29 N.Y.2d 426, 278 N.E.2d 895, 898, 899, 328 N.Y.S.2d 653, 656, 657 (1972).[22]

■ CHB, DnC, and KOP have each marketed in excess of $100 million of commercial paper through New York brokerage firms. The plaintiffs contend that

---

**22.** According to the plaintiffs, "The Second Circuit ... articulated another theory of jurisdiction over CHB, DnC and KOP based on their close relationship to NABC" in *Beech Aircraft Corp.* Plaintiffs' Memorandum in Opposition at 147. This statement mischaracterizes that opinion, which merely summarized the law pertain-

ing to jurisdiction over parents doing business in New York through their subsidiaries. The plaintiffs seek leave to depose NABC on the "new" issues raised by the *Beech Aircraft Corp.* decision. Since, however, the issues are not new, the request is denied.

such sales bring the moving defendants within the ambit of CPLR § 301. No New York case has addressed the question of whether a non-residents' marketing of commercial paper through New York agents constitutes the doing of business in this state. Somewhat analogous cases hold that a company does not "do business" by listing its stock on a New York exchange. *Gilson v. Pittsburgh Forgings Co.*, 284 F.Supp. 569, 570–71 (S.D.N.Y.1968); *Sunrise Lumber Co. v. Homer D. Biery Lumber Co.*, 195 A.D. 170, 173, 185 N.Y.S. 711, 713 (2d Dep't 1921); *Joseph Walker & Sons v. Lehigh Coal and Navigation Co.*, 8 Misc.2d 1005, 1006, 167 N.Y.S.2d 632, 633–34 (Sup.Ct.N.Y.County 1957). In this instance, the sale of commercial paper is an essential aspect of the Nordic defendants' business. Thus, their sales are somewhat more significant than the contacts in the aforementioned cases. On the other hand, the notes are not sold directly by the Nordic defendants to the public. Rather, the banks sell them to New York commercial paper dealers who then reoffer them to United States investors. The Nordic banks' contacts with New York in this regard are limited, sporadic, and not so substantial and continuous as to support a finding that the banks are doing business here.[23]

■ Assuming, *arguendo*, that the sale of commercial paper constitutes "doing business," the Supreme Court's decision in *Helicopteros Nacionales v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984),

forecloses the exercise of personal jurisdiction on this basis. In the *Helicopteros* case, the Court considered whether Texas could constitutionally assert personal jurisdiction over a foreign company that had purchased 80% of its helicopter fleet, and all of its spare parts and accessories from a Texas company. The defendant had no other cognizable contacts with Texas. *Id.* at 1871. The Court found Helicopteros' Texas transactions insufficient to warrant the exercise of jurisdiction over "a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 1874 (footnote omitted). As in *Helicopteros*, DnC, CHB, and KOP lack the traditional indicia of doing business in New York. Their commercial papers sales are, if anything, less important than the purchases in *Helicopteros* and constitutionally insufficient to support the exercise of jurisdiction over a cause of action not arising out of that sale.

### b. CPLR § 302

New York's long arm statute, N.Y.Civ. Prac.Law § 302(a) (McKinney 1972), vests the courts of the state of New York with "personal jurisdiction over any nondomiciliary ... who, in person or through an agent ... (1) transacts any business within the state, (2) commits a tortious act within the state, and (3) commits a tortious act without the state causing injury within the state" as to any cause of action arising out of such act or transaction.[24] The plaintiffs contend that KOP, DnC, and CHB are subject to this Court's jurisdiction under all

**23.** DnC and CHB have also underwritten several multi-million dollar securities offerings and have designated New York brokerage firms to represent them in connection with these offerings. These infrequent forays into investment banking were neither substantial nor continuous enough to establish the corporate defendants' presence in New York.

**24.** *The long arm statute reads, in pertinent part,* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any noncomiciliary, ... who in person or through an agent:

 1. transacts any business within the state; or

 2. commits a tortious act within the state ...; or

 3. commits a tortious act within the state causing injury to person or property within the state ..., if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

N.Y.Civ.Prac.Law § 302(a) (McKinney 1972).

three sections of the New York long arm statute.

### i. Transaction of Business

The attendance of a corporation's director representatives at board meetings in New York constitutes the transaction of business by the corporation. *See General Reinsurance Corp. v. Plymouth Mutual Life Insurance Co.*, 280 F.Supp. 66, 70–71 & n. 4 (S.D.N.Y.1968) (indicating that attendance of corporate officers at a board meeting in New York would subject the corporation to jurisdiction under CPLR § 302(a)(1)); *Streifer v. Cabol Enterprises Ltd.*, 35 Misc.2d 1049, 231 N.Y.S.2d 750, 751 (Sup.Ct. Ulster County 1962), *aff'd*, 19 A.D.2d 948, 245 N.Y.S.2d 337 (3d Dep't 1963) (board of directors meeting in New York constituted "transacting business"); *Pomeroy v. Hocking Valley Railway Co.*, 218 N.Y. 530, 535, 113 N.E. 504 (1916) (same). The plaintiffs thus correctly assert that DnC, KOP, and CHB transacted business in New York when their officers each attended two NABC board meetings there in their capacity as director representatives of CHB, DnC, and KOP.[25]

■ However, the jurisdictionally significant evidence provided by the plaintiff does not satisfy a fundamental requirement of CPLR § 301(a)(1): that the cause of action asserted must arise out of the defendant's activities in New York. *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 227 N.E.2d 851, 281 N.Y. S.2d 41, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). The plaintiffs have not shown that the remaining counts in the amended complaint against the defendant corporations arose from DnC, CHB, or KOP's only New York business transactions, their attendance at NABC board meetings there.

The redacted minutes[26] of the first of the two New York board meetings on October 3, 1980, describe a presentation by

Lewis Eisner, a consultant hired to assist NABC in its dealings with Trend. Some of the board members questioned Eisner about the strategy that might be appropriate in dealings with Trend. Eisner responded that cooperation appeared best. At the close of the meeting, the board asked that it be kept informed of Eisner's progress. The redacted minutes of the April 3, 1981, NABC board meeting in New York indicate that an NABC officer described the proposed settlement to the board. That was the extent of the discussion of Trend at that meeting. This tendered proof respecting the two New York meetings reveals little connection between the two meetings and the three fraud claims alleged against the moving defendants. The nature of the original Flourtown loans and the rate of interest on all of the loans to Trend—the underpinnings of the first and seventh causes of action—were not discussed. The only discussion relating to the realignment of the Flourtown loans—the basis of the fifth count—was a progress report. No action was taken or authorized in that matter. Thus, the first, fifth, and seventh causes of action do not arise out of the defendants' New York transactions. The Court cannot premise jurisdiction over the moving defendants on CPLR § 302(a)(1).

### ii. CPLR 302(a)(2)

■ CPLR § 302(a)(2) subjects those committing tortious acts within the state to the jurisdiction of the New York courts. The defendants only New York acts occurred at the two New York board meetings. The discussion above makes clear that the plaintiffs have failed to show that the defendants committed any act, let alone a tortious act, at those meetings. At most, the defendants, through their representatives, passively inquired about the Trend situation. CPLR § 302(a)(2) does not sub-

---

**25.** In his affidavit, Ostergaard indicates that he attended the second meeting only to submit his resignation and otherwise played no role there. Ostergaard Affidavit at ¶ 3.

**26.** NABC's counsel redacted the minutes of its board meetings to exclude references to discussions pertaining to matters other than Trend. Naper Affidavit ¶ 3.

ject the moving defendant corporations to this Court's personal jurisdiction.

### iii. CPLR § 302(a)(3)

The third section of the New York long arm statute permits a court to exercise jurisdiction over a party who "commits a tortious act without the state causing injury' to person or property within the state...." N.Y.Civ.Prac.Law § 302(a)(3) (McKinney 1972). Although DnC, CHB, and KOP took actions outside of New York that related to Trend, the plaintiffs have provided no evidence indicating that any of those acts were tortious.

The plaintiffs present the following facts. On November 19, 1980, Kaila, Naper, and Ostergaard attended a meeting of the NABC board in London, England. At that meeting, John Nelson, NABC's president, distributed a written status report concerning the Trend account. Nelson also discussed the Trend situation. The directors voiced concern about the documentation of the Flourtown loans and requested a report on the problem. They also authorized two studies: an analysis of the adequacy of the collateral underlying the Flourtown loans and a study by Eisner. Earlier, Ostergaard and Naper had each sent several telexes to NABC in New York that related to the Trend situation. In these telexes, Ostergaard expressed concern about the Trend loans, asked to be kept informed about the situation, and offered some thoughts on the manner in which Eisner might be paid. In two telexes, dated September 28, 1979, and October 29, 1979, Naper expressed his thoughts about several of the Northern Telecom portfolio transactions. In deposition testimony, Naper and Ostergaard both recall discussing Trend with the other. Neither recalls acting to Trend's benefit or to its detriment. Other memoranda and communications brought to our attention simply indicate that Ekman and NABC's executives kept the moving defendants informed.

The allegations in the amended complaint do not augment the plaintiffs' factual showing. The conclusory, undocumented allegations that the moving defendants and their officers participated in the alleged frauds, *see, e.g.*, amended complaint ¶¶ 52, 56, 261, 289, cannot suffice on this motion. The complaint also alleges that during the October 3, 1980 board meeting Ekman, Ostergaard, Naper, Kaila, and others approved the so-called "realignment fraud." The minutes of that meeting belie that assertion. *See supra* pp. 567–568. Although, we accept, for purposes of this motion, the allegation in paragraph 188 of the amended complaint that Ostergaard and Naper telephoned Nelson and Mathews to express their opposition to certain transactions, the insufficiency of the combined weight of the evidence of tortious conduct remains apparent.

None of the documented allegations establishes *prima facie* the tortious conduct, namely fraud, that the complaint alleges against the moving defendant corporations. The elements of a fraud claim in New York are representation of a material fact, falsity of that representation, scienter, reliance, and damages. W. Prosser, *Handbook of the Law of Torts* § 105, at 685–86 (4th ed. 1971); *see Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 250 N.E.2d 214, 217, 302 N.Y.S.2d 799, 803 (1969). The plaintiffs have utterly failed to establish *prima facie* that the moving defendants made or caused to be made a single false representation or otherwise intentionally participated in any tortious conduct.[27] CPLR § 302(a)(3) cannot supply the basis for the exercise of jurisdiction over the moving defendant corporations. The claims in the complaint against DnC, CHB, and KOP are dismissed for lack of personal jurisdiction.[28]

---

**27.** Although the amended complaint alleges tortious conduct other than fraud, the moving defendants are not named in any of the counts alleging such conduct.

**28.** To the extent that the complaint attempts to assert claims other than fraud against DnC, CHB, and KOP, those claims are dismissed as well. These defendants' jurisdictionally signifi-

### 2. The Individual Defendants

Since the Court is without jurisdiction over DnC, CHB, and KOP, it, *a fortiori,* lacks jurisdiction over Naper, Ostergaard, and Kalia, those through whom the corporate defendants allegedly acted. In addition, New York's "fiduciary shield doctrine" shields these individuals and the other moving defendants, Smith and Sclater, from this Court's jurisdiction under the New York long arm statute.[29]

The courts of this circuit have consistently held that New York long arm jurisdiction cannot be asserted over an·individual defendant based upon acts performed by that person in his capacity as a corporate official. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir.1981); *Lancer Products, Inc. v. Rally Accessories, Inc.,* 597 F.Supp. 440, 442 (E.D.N.Y. 1984); *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1565 (S.D.N.Y.1983). The New York cases have adopted this doctrine. *See Laufer v. Ostrow, supra,* 449 N.Y.S.2d at 460–61, 434 N.E.2d at 696–97; *Sheldon v. Kimberly-Clark Corp.,* 105 A.D.2d 273, 482 N.Y.S.2d 867, 869 (2d Dep't 1984); *Laurenzano v. Goldman,* 96 A.D.2d 852, 465 N.Y.S.2d 779, 780 (2d Dep't 1983). The courts apply it to all three subsections of the New York longarm statute. *See Goshen Litho, Inc. v. Kohls, supra,* 582 F.Supp. at 1565 (doctrine applies when personal jurisdiction asserted under § 302(a)(1)); *Lancer Products, Inc. v. Rally Accessories, Inc., supra,* 597 F.Supp. at 442 (same with

§ 302(a)(2)); *Sheldon v. Kimberly-Clark Corp., supra,* 482 N.Y.S.2d at 869 (doctrine applies in context of sections a(1), (2), and (3)).

■ All of the actions of the moving defendants upon which the plaintiffs urge us to premise jurisdiction occurred in those individuals' capacity as officers of their respective banks. Such contacts cannot subject them to this Court's jurisdiction under the New York long arm statute.[30]

It matters not that some of the individual defendants (Ekman, Sclater, and Smith) are alleged to have acted in New York through their agents or in conspiracy with such agents. An agent's act may subject an individual to this Court's jurisdiction, *see Collateral Factors Corp. v. Meyers,* 39 A.D.2d 27, 330 N.Y.S.2d 833, 835 (1st Dep't 1972), as may those of a co-conspirator, *see Grove Press, Inc. v. Angleton,* 649 F.2d 121 (2d Cir.1981). Underlying the agency and conspiracy theories of jurisdiction is the premise that the acts of an agent (or co-conspirator) may be attributed to a principal. The fiduciary shield doctrine which shields corporate officers from their own actions, should also protect those deemed to have acted through others.

In denouncing the fiduciary shield doctrine, Judge McLaughlin has commented, "What policy is served by immunizing a corporate officer who acts in the interest of his corporate master—other than a vague sense of unfairness—eludes this writer."

cant contacts relate only to the fraud claims in the amended complaint.

CHB and DnC originally moved for summary judgment on the RICO and fraud claims against them. The Court need not consider these motions, since the claims have been disposed of on jurisdictional grounds. The plaintiffs' motion ordering a continuance of the summary judgment motions pending further discovery is also rendered moot.

**29.** The plaintiffs do not assert that the individual defendants are doing business in New York.

**30.** In *Calder v. Jones,* 465 U.S. 1482, 104 S.Ct. 1482, 1485 n. 5, 79 L.Ed.2d 804 (1984), and in *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1478 n. 4, 79 L.Ed.2d 790 (1984),

the Supreme Court held that the fiduciary shield doctrine is not grounded in the due process clauses of the first or fourteenth amendments. The doctrine is thus inapplicable in an action brought under RICO or another federal statute that extends jurisdiction to the limits of due process. *Soltex Polymer Corp. v. Fortex Industries, Inc.,* 590 F.Supp. 1453, 1458 (E.D.N.Y. 1984) (McLaughlin, J.). However, it remains a gloss on the New York long arm statute, which does not extend that far. *See Photo Promotions Associates v. Household International, Inc.,* 584 F.Supp. 1238, 1248 (S.D.N.Y.1984) (Weinfeld, J.) (decided one month after *Calder* and *Keeton* and applying fiduciary shield doctrine).

J. McLaughlin, Practice Commentaries, N.Y.Civ.Prac.Law § 301, C302:3 (McKinney 1972). The unfairness to which Judge McLaughlin refers is that inherent in subjecting individuals whose only relevant contacts arise from activities undertaken not for their own benefit but for the benefit of employers to the jurisdiction of the New York courts. The Court can discern no reason for protecting some and not others from this perceived unfairness. A corporate official who never enters the state should be no more susceptible to this Court's process than one who often visits. A corporate official who himself commits a tortious act outside of the state should be no less susceptible to jurisdiction than one who does so through someone else.

The fiduciary shield doctrine prevents the Court from exercising its jurisdiction over any of the individual defendants moving to dismiss for lack of jurisdiction. Their motions to dismiss the claims against them are granted.

## IV. *Conclusion*

The defendants' motion to dismiss the RICO claims is deemed withdrawn. Their motion to dismiss the eighth claim is granted in part and denied in part. The motion to dismiss the ninth claim in the amended complaint is granted. The motion to dismiss the twelfth claim is denied. The motions to dismiss the fourteenth and sixteenth claims are granted. The motion to dismiss the fifteenth claim is granted. The motion for summary judgment on the seventeenth claim is denied. The plaintiffs are ordered to replead their amended complaint within thirty days in accordance with the instructions herein. The motions of DnC, KOP, CHB, Ekman, Kaila, Ostergaard, Naper, Smith, and Schlater to dismiss the actions against them for lack of personal jurisdiction are granted. In light of the disposition of the aforementioned motions, the Court need not consider the other motions before it.

SO ORDERED.